**Jeffrey FINO**

v.

**The McCOLLUM MINING COMPANY et al.**

**No. CA3–80–0496–F.**

United States District Court,
N. D. Texas,
Dallas Division.

Jan. 29, 1982.

James M. Murphy, Dallas, Tex., for plaintiff.

Joseph P. Paonessa, Robert F. Maris, John P. Lilly, Marc S. Culp, Kolodey, Thomas, Dooley, Maris & Lilly, Dallas, Tex., for defendants.

## ORDER

ROBERT W. PORTER, District Judge.

Currently pending before the Court are several motions brought in behalf of the Defendants in this action which arise out of the less than sincere efforts of counsel to this action to proceed with discovery in a reasonable manner. I have oftentimes wondered whether the liberal federal discovery rules have the capability of turning the administration of justice into "trial by ordeal," and the facts and occurrences of this case add support for the theory. Nevertheless, as I must, I address the merits of these discovery motions with the zeal and zest of a twenty-six year old law clerk.

The first matter on the agenda is the motion for costs filed by the Defendants as a result of an ill-fated discovery junket to Quito, Ecuador. On June 8, 1981, Plaintiff noticed the taking of depositions of at least ten witnesses to be held in Quito. Defendants, fearing that the trip to Quito without the benefit of compulsory process would be futile, timely moved the Court for a protective order quashing the notices. The Court considered the motion, and denied it on June 26, 1981, stating that if the trip to Quito was a "wild-goose chase" as Defend-

ants feared, the Court would entertain a motion for costs pursuant to Rule 30(g)(2) of the Federal Rules of Civil Procedure. Having participated, and having failed to capture the elusive and slippery wild goose of Plaintiff's choice, Defendants now move the Court for an award of costs incurred in the hunt.

In considering the motion, I have examined with little zeal and zest the transcripts of the proceedings in Ecuador. The first wild goose in this parade of madness is the interpreter, a Mr. Adderly, whom counsel for Plaintiff arranged to be present at the taking of the depositions. Counsel for Defendant cross-examined Mr. Adderly concerning his qualifications as a legal translater and then objected to his participation as an interpreter due to his lack of experience in translating legal matters. Mr. Adderly had never translated oral testimony, and the record reflects that he had difficulties during the proceedings. Undaunted, the actors in this Pirandello play [1] marched on.

The next witness to give his oral testimony was Dr. Renan Proano Rodriguez. Although counsel for Plaintiff noticed Dr. Rodriguez and represented to the Court that he would voluntarily give his testimony, Dr. Rodriguez stated unequivocally that he had not consented to testify and further that he had never been requested by Plaintiff or his counsel to testify voluntarily concerning any matters pertinent to this lawsuit. Dr. Rodriguez is an attorney in Ecuador ("abogado"), and two of the witnesses noticed by Plaintiff are his clients. He stated that these two people, Elia Isaacs, and Suzanna Mulligan, had not been asked to testify either and that they would not consent to do so. This was the first day in Quito, and the occurrences recounted above were but an indication of things to come.

The following day, June 30th, 1981, the parties and counsel assembled in a penthouse suite of the Chalet Suisse Hotel in Quito in order to take the deposition of Richard Serrano Solano. Mr. Solano testi-

fied that he was asked by the Plaintiff, Jeffrey Fino, to testify and that he had voluntarily appeared to give his testimony. Counsel for Plaintiff examined Mr. Solano and actually elicited testimony which appeared to be leading to evidence pertinent to the cause of action alleged by Plaintiff. Unfortunately, however, the government of Ecuador intervened at this stage in the proceedings as the vice-president of this Latin country elected to take his lunch in the penthouse in which the proceedings were taking place. Hence, our actors, still desperately in search of an author as well as a stage, adjourned to a forum not entirely inappropriate for these proceedings, a bar room in the same hotel. There, the oral testimony of Joe Brenner was taken. Mr. Brenner appeared voluntarily at Plaintiff's request and the substance of his testimony related to certain Ecuadorian artifacts, such as blowguns and feather necklaces, and their value. The materiality of this testimony derives from Plaintiff's pendent claim that the Defendants converted the artifacts from Plaintiff. Following the Ecuadorian vice-president's luncheon, our entourage emerged from the darkness of the bar room and resumed proceedings in the penthouse. At this time it was late in the evening and the proceedings were adjourned until the following day.

July 1st, 1981 was a day of intrigue and excitement in Quito, Ecuador. Counsel for Plaintiff continued his direct examination of Mr. Solano at approximately 11:00 a. m. and it became readily apparent that counsel were getting testy. First, counsel for Plaintiff noted on the record that the lunch break extended until around 2:00 p. m. "due to a lunch delay at a restaurant which [counsel for Defendant] recommended...." Near the end of the day, after Mr. Solano left the deposition room, counsel for Defendant inquired of counsel for Plaintiff as to which other witnesses would be available for testimony. The response was vague and unilluminating. That evening, in the

---

1. *See* Luigi Pirandello, "Six Characters in Search of an Author," *published in* THREE PLAYS (Samuel French, Inc., N.Y., 1923).

hotel, counsel for Defendants saw the Plaintiff, Jeffrey Fino, in the company of a woman whom he believed to be Anna Fauchois, one of the witnesses included in Plaintiff's notice of deposition. Earlier in the course of the proceedings in Quito, Plaintiff's counsel stated that he was uncertain as to whether Ms. Fauchois would appear and give her testimony. It would be Ms. Fauchois' appearance in the hotel that would spark the intrigue and controversy mentioned above.

At the beginning of proceedings the following day defense counsel asked the witness to leave the deposition room for a discussion with Plaintiff's counsel on the record. At that time defense counsel reiterated his request for a list of the witnesses who would actually be examined in the upcoming proceedings. Plaintiff's counsel blithely referred him to the notice of deposition originally filed prior to this ill-fated discovery junket. At this point, the respective attorneys engaged in the following enlightened, meaningful, and productive dialogue:

> MR. PAONESSA: I have a right to know exactly who you may be calling as a witness.
>
> MR. MURPHY: No, you don't.
>
> MR. PAONESSA: Yes, I do.
>
> MR. MURPHY: I do not—I am not on your schedule, counsel.

Truer words were never spoken. While I question whether both counsel were on the same planet, much less the same schedule, that issue is not before me.

Immediately following this intellectual interchange, the specter of unlawful electronic surveillance was raised, I quote from the record:

> MR. MURPHY: There's a matter that concerns me very much and I want to ask you on the record if you have any knowledge or participation or a combination in the surveillance of this Penthouse Suite, by either electronic means or otherwise or any of your agents, clients, employees or servants?
>
> MR. PAONESSA: Absolutely not. I know nothing.

> MR. MURPHY: Fine. That's all I have.
>
> MR. PAONESSA: Would you care to proffer what it is that you are concerned about at this time?
>
> MR. MURPHY: Electronic surveillance of this room.
>
> MR. PAONESSA: Would you care to show me where it was and produce a witness that stated that—
>
> MR. MURPHY: You said you have no knowledge?
>
> MR. PAONESSA: That's right.
>
> MR. MURPHY: That's all I wanted.
>
> MR. PAONESSA: These are shallow accusations.
>
> MR. MURPHY: I asked you if you had any knowledge.
>
> MR. PAONESSA: If you have any concern, then, let's hear about it. I know absolutely nothing, but I don't want any type of innuendoes on this record or anything, and that's all I've heard from you.
>
> MR. MURPHY: You indicated to me a few minutes ago that I informed you last night on the telephone that I have a surprise witness.
>
> MR. PAONESSA: You have a witness.
>
> MR. MURPHY: Do you know that the term "surprise witness" was used in this room last night?
>
> MR. PAONESSA: No, I did not.
>
> MR. MURPHY: For your benefit and it was not on the telephone, counsel. It was used for your benefit, only to determine whether or not our speculations that this Penthouse Suite has been under surveillance by someone—
>
> MR. PAONESSA: Mr. Murphy, the only thing I can tell you is I know that there is a witness here because I saw Mr. Fino going up the elevator last night with a person I believe to be Miss Fauchois or whatever the French girl—I don't remember what her name was, and I have trouble with the pronunciation of her name, Anna Fauchois.
>
> MR. MURPHY: What time was that?
>
> MR. PAONESSA: I know it was before 11 o'clock because it was before I talked to you on the phone. My best guess, was

sometime between when we finished our deposition and when I talked to you on the phone. I can tell you what Mr. Fino had on. I can tell you what the witness has on. I can probably describe her to you.

MR. MURPHY: At this time, do you want to tell us about it?

MR. PAONESSA: Mr. Fino, I believe, had some sort of khaki outfit on.

MR. PAONESSA: I was either upstairs in the cafeteria or by the desk. I believe I was by the desk at the time because I was inquiring about some matters that had come up.

MR. MURPHY: Did Mr. Fino acknowledge your existence?

MR. PAONESSA: No, he did not. My presence, you might say. And the woman, as I recall, had sort of a .. what's the term when a woman puts white stuff on her hair?

MR. FINO: Frosted?

MR. PAONESSA: Frosted sort of hair. As I recall, it was short. She had some sort of a khaki outfit, was tall and thin and I believe had some sort of hat on.

MR. MURPHY: Well, you're correct. She had a hat on her head, and Anna Fauchois is here.

MR. PAONESSA: What is the deal about telling me?

MR. MURPHY: Because I don't know if she's going to testify.

MR. PAONESSA: How can you say on the record you don't know if she is going to testify or not, when you represented to Judge Porter last week that she would?

MR. MURPHY: I represented that she would be here and we had no intention to take her deposition.

MR. PAONESSA: And that she agreed to testify.

MR. MURPHY: And she has agreed to testify and I may, as a matter of my own trial strategy, reserve my questions for her until the time of trial. I don't know the answer to that because I don't know if I'm going to call her or not.

MR. PAONESSA: I'm going to object to each and every person that you do not call.

MR. MURPHY: Fine. You can do what you want counsel. You can do whatever you want.

Contrary to Mr. Murphy's last assertion, counsel cannot do "whatever they want" in a deposition taken pursuant to the Federal Rules of Civil Procedure, at least not in this Court. Nevertheless, defense counsel proceeded with his cross-examination of Dr. Solano.

To worsen matters, on June 30th, 1981, defense counsel raised another matter which soon added fuel to the already firmly stoked inferno of futility. Mr. Paonessa, after consulting with Dr. Renan Proano Rodriguez, the abogado, advised Plaintiff's counsel that Richard Serrano Solano was committing an Ecuadorian crime by reason of his testimony that he signed Plaintiff's Exhibit Number Two as a witness. The following day Plaintiff's counsel launched a counterstrike, alleging that the Defendants and their counsel were attempting to intimidate Plaintiff's witnesses, including but not limited to Solano. Mr. Murphy indicated that he had information that the Defendants were sending telegrams to some of the witnesses, and that this was part of a larger scheme to intimidate the witnesses who had been noticed. Mr. Paonessa denied the allegations, and in particular denied Mr. Murphy's allegations concerning bad faith. At this point, the lawyers engaged in another productive verbal interchange:

MR. MURPHY: That still has nothing to do with the fact that this witness [Solano] is under a shroud at this time.

MR. PAONESSA: No. There is no shroud.

MR. MURPHY: Yes. There is a shroud.

As this highly disputed issue remained unresolved, Mr. Murphy proceeded to take the deposition testimony of Dr. Ricardo Izurieta Mora Bowen, an Ecuadorian lawyer. This witness testified that, in his opinion, Solano had not committed an Ecuadorian crime by testifying about Plaintiff's Exhibit Number Two. Subsequent to his testimony Mr. Paonessa stipulated that such was the case.

At this point, Mr. Murphy, and the witness, who had been retained to represent Solano, insisted that Dr. Rodriguez appear and state his opinion on the matter as well as to agree that no criminal proceedings would be instituted against Solano. Mr. Paonessa, on the verge of losing his mind, then objected to the entire proceeding. Nevertheless, his mind intact, he agreed to attempt to produce Dr. Rodriguez. Thereafter, counsel resumed the deposition of Solano, continuing into that evening on July 1st.

The next controversy which arose concerns the testimony, or lack thereof, of Elia Isaacs and Miss Friedman, two persons included in Plaintiff's notice of deposition. Mr. Murphy contended that Defendants had contacted these witnesses and influenced their availability to testify concerning this case. Mr. Paonessa admitted that he and Mr. McCollum, Defendant herein, had contacted Miss Friedman, but only for the purpose of ascertaining whether she would in fact testify, or even whether she had been asked to testify voluntarily and had agreed. Mr. Murphy insisted that Mr. Paonessa arrange for a meeting with these two witnesses in order to clear matters up and Mr. Paonessa agreed to attempt to do so. This also occurred on the morning of the second of July, 1981.

This sort of nonsense continued through the fourth of July. When all the dust had settled, it would seem to be a reasonable conclusion that the fine people of Ecuador probably had a poor taste left in their mouths with respect to American judicial proceedings. As best as I can tell, and for the purposes of Defendant's motion for costs, the final tally reflects the following:

1. of the ten noticed witnesses, all of whom counsel for Plaintiff represented would appear voluntarily and testify, only four actually appeared and gave their testimony;

2. Plaintiff had not in fact secured the consent of most of the witnesses to appear and testify;

3. the majority of the testimony actually taken and recorded is the testimony and argument of the lawyers.

4. contrary to prior assertions by counsel for Plaintiff, these discovery proceedings produced no evidence pertinent to Plaintiff's federal law claim to which Defendants have filed a motion for summary judgment.

Pursuant to Rule 30(g)(2) of the Federal Rules of Civil Procedure I am going to impose an award of costs upon the Plaintiff. Defendant has filed with the Court an itemization of expenses incurred on this ill-fated discovery junket. With regard to this itemization, the Court notes that Defendants have claimed as an expense the cost of the transcripts of the proceedings in Ecuador in the amount of $1,632.43. Yet, it has been called to the attention of the Court that the court reporters who had to suffer through this fiasco have not yet been paid the same amount for their services. Accordingly, it would appear that these costs cannot be claimed by the Defendants. The Court takes a very dim view of claims for expenses not incurred. Accordingly, I will not award these expenses as claimed by the Defendants until Defendants submit some evidence to this Court that the court reporter fees have been paid. Upon such a showing, Defendants will be granted a supplemental award of costs equal to the amount of these fees. Having thus excluded these fees, I have determined that an award of $7,000.00 from the Plaintiff to Defendants is appropriate. In reaching my decision I have considered Defendant's itemization of expense submitted with the Court. In addition, I have also considered the fact that four of the witnesses which were noticed did in fact appear and testify. Further, I have examined the transcripts of the proceedings in Ecuador and conclude that, although present at the scene of the crime, the Defendants and their counsel did nothing to exacerbate the situation. Finally, I had considered imposing some of the costs against counsel for Plaintiff but will not do so because it seems clear that it was Plaintiff who undertook to contact these witnesses and obtain their consent to appear and testify.

Also before the Court at this time is Defendants' motion to strike and for sanctions in connection with Plaintiff's responses to interrogatories. The Court has reviewed the motion as well as the responses and briefs and determined that the motion should not be granted at this time. The Court does note, however, that the conduct in this proceeding is highly questionable. Therefore, I will order Plaintiff once again to fully and completely answer Defendants' interrogatories no later than ten (10) days from the date of this Order. Further, if Plaintiff fails to comply I will award more costs, but this time they will be incurred by counsel for the Plaintiff. This approach holds true for any further discovery disputes with which the attorneys and parties attempt to burden this Court. I have nearly 400 cases on my docket and this case, and its discovery follies, are taking up more space and time than any other case on the docket.

Finally, in order to reflect the Court's ruling at the hearing on the matter, Defendants' motion to compel production of the Serrano transcript is in all things granted.

Wherefore, in light of the foregoing

It is ORDERED that Defendants' motion for costs is GRANTED; Plaintiff is directed to pay over to Defendants costs in the amount of $7,000.00; the Court will entertain a supplemental motion for transcript costs upon a showing by Defendants that those costs have been paid;

It is FURTHER ORDERED that Defendants' motion to strike is DENIED; Plaintiff is directed to fully and completely answer Defendants' interrogatories within ten (10) days of the date of this order; if Plaintiff fails to do so the Court will entertain a motion for costs;

It is FURTHER ORDERED that Defendants' motion to compel the production of the Serrano transcript is in all things GRANTED; and

It is FURTHER ORDERED that this action is set for trial on the Court's June 7th, 1982 jury docket, with all discovery to be completed no later than April 19th, 1982, and all motions [except motions in limine—see Local Rules] to be submitted no later than May 3rd, 1982.